Please be seated. Your Honor, this is the third case in the morning called 2-11-07-75. People of the State of Illinois v. Gary W. Schuning. On behalf of the Appalachians, Mr. Stephen E. Wilkins. On behalf of the Appalachians, Mr. Thomas Minzer. Mr. Wilkins? Good morning, Your Honor. I don't want to get too deep into the weeds of the facts of this case, but I want to set the table for a few things because they'll become critical for my argument later on. My client is convicted of the murder of Doris Fabriano, who was his mother, and a woman named Christy Henning, who was the last of three escorts to visit the defendant's house on the night of this offense, or I should say morning. These other two women were named Amanda Mathis and Samantha Hemming, respectively. And my client made three statements to the police. They're all recorded. And in all of those statements... Were there four or three? Four. There were four. Wasn't there one on February 7th? Well, there was one very brief one he made to the police at the house, and then there was a recorded one in the hospital as he was recovering from his wounds. And then there was one the very next day on the 28th of February, and then the third recorded statement would have been on March 7th. March 7th. That's it. March 7th. That's right. I'm sorry. I didn't mean February. I was just thinking of the recorded statement. Okay. But in all of these statements, my client admits killing Doris. But in all of the statements, with the exception at the very end of the last one, he insists that Christy Hennig, the escort, came after him with a knife either at the opening to the bedroom or the bathroom in the upstairs of the house. And then he panicked and he stabbed her. And he also never mentioned that there were any men in the house, with the exception of the police officers, who came to the scene. Now, on the other hand, my client testified that he didn't have any memory of any of these events. But very importantly, and for the purposes of my argument, he did not deny causing the deaths of Hennig and Pagliaro. Let me ask you one question. When did he have the open-heart surgery? Right away when he got to the hospital or was that afterwards? Or the heart repair surgery or whatever it was? I'm really not sure, but I know the police are talking to him at 2.26 p.m. And he had been out of the surgery for a couple hours prior thereto. And the police arrive at the house at about 9.15 a.m., if that helps. Counsel, it would be fair to say, in light of all of this, that the defendant gave inconsistent and conflicting statements at times regarding his involvement in the offenses, correct? Yes, he did. And wasn't that part of the dilemma or the untenable problem for the defense counsel? Well, yes, it was. But one thing he was relatively consistent about, and that's my point, is that he got into this confrontation with Hennig. That was about the only thing he was consistent about, in frankness. And from the defense point of view, it seems to me that if there's a source for any defense here on this record, it's justifiable use of force as to Hennig or perhaps second-degree murder, provocation. Because his other defense to these charges and— Was that he didn't do anything wrong, that he was a victim. Yeah, that he was a victim. And if I may get into that for a moment, because my opponent makes this point that, well, to raise this justifiable use of force defense is going to be a derogation of, it's going to detract from this other defense. But what is this other defense? Well, I don't know what to dub it. It's either the killer quartet or the killer trio defense. Well, there was a group. Pardon me? There was a group. There was a group. There was Amanda Mathis, perhaps with or without her driver, a man named Danny Conover, and this woman, Samantha Abney, with this man who is known only to the world as Daryl. And they go into the house. And Doris Bagliaro encounters these people, and she's upset that they're all in the house. So they decide to kill her. And then Christy Henning comes to the door, and she knocks on the door, and she is briefly admitted, and she sees that there's this man in there, and that she has to be eliminated because she's a witness. Now, somehow the defendant in this defense theory is oblivious to all this that's going on, but these three or four people attack him, but they have to break off the assault and run away. I know what you seem to be saying, and it's a plausible argument. Arguably, he could have adapted the self-defense strategy, which, however, as I understand the law, would have necessitated the giving of a second-degree murder instruction as well. The strategy that the defense counsel adapted in this case was sort of, for lack of a better phrase, an all-or-nothing defense. And yet to get back to really hone in on the law and the facts here, generally isn't it true that counsel's decision to adapt one trial strategy over another would be considered to be trial strategy, correct? Generally, yes. Which, if it's reasonable and sound, is considered to be, you know, could not be the basis for ineffective assistance of counsel. So, yes, he could have argued the self-defense, but, you know, I see here in light of the inconsistent statements why he would have adapted this. Because if you go with self-defense, wouldn't defense counsel be in the position of trying to pick and choose and say which statements the defendant made were believable and credible and which weren't? Because you have a dilemma. In some of them, you know, he makes self-exculpatory statements. In others, he says he killed his mother, right? So you have a problem. By adapting this strategy, can't he argue that, you know, there was this group? He doesn't have a clear memory. Any statements he gave, any incriminating statements, were the product of the coercive police interrogation. And he could walk completely if the strategy was believed. Yes, I agree in the hypothetical that, yes, you know, if you have this strategy. I guess what I'm trying to say is that this strategy is, well, in all frankness, it's off the wall. Because the only data points we have to support this idea that these other people did this are apparently a watery stain on the driveway, which suggests that there was a vehicle parked there. And the numerous knives found about the house. There's DNA of other people on the knives. And he doesn't have his fingerprints on any of them. And his fingerprints are not on any of those knives, except for the one that he threw at the police, right? That's right. That's right. But he's got life-threatening injuries. Because, indeed, if someone else did, you might expect their fingerprints to be on there. What about the life-threatening injuries? Doesn't that corroborate this group theory? Because, you know, you have, you know, the lack of the fingerprints. And then you've got him stabbed with life-threatening injuries. Doesn't that tend to support the group theory? But, you know, that would also support the theory that he was stabbed by Henny. Well, but two equally plausible defense theories, why would that be an effective assistance? Tell us succinctly why two plausible theories, one of which is adopted by the defense, amounts to an effective assistance. I guess where we differ, I guess, is the plausibility of the defense theory and the idea that, well, you know, we're going to really lose a lot of our thunder if we suggest to the jury that, you know what, there was this encounter with Henny which turned deadly. Because, keep in mind, my client testified that he had two other women over to the house that evening, or that morning, I should say. One at about 6 in the morning and one at about 8. That would have been Mathis and Henny. And he paid for both of their services, and neither of them said that my client was particularly aggressive or that he was argumentative or anything. In other words, he didn't hurt them at all. And he apparently paid good money, his own money, cash, for Mathis, and all he did with her was sit around the living room smoking joint. So he certainly wasn't the type to be upset that, well, he didn't like the girl to come over or he didn't like the terms of the deal. Well, you've indicated that the group theory seems a little implausible, and I can see you have some intuitive appeal on the argument. What's the defense theory? Why did Koning kill his mother? What's the plausible theory why she killed his mother? Going with self-defense, she killed his mother and then attacked him. What's the motive behind that? Is that a very plausible reason? I'm not really positing that it's part of this defense that Henny killed Doris Pagliaro. Well, if the group didn't kill her and he didn't kill her, who killed her? If it wasn't Henny. Well, he would have been stuck with the idea that it was the defendant who did it, I guess, or alternately it may have been Henny, yes, but… Then why would Henny kill her? Well, there's no reason for that. And he wasn't in the group. My problem is that he didn't posit that Henny was part of the group. I might agree with that. I understand that, but if it weren't self-defense and there was no group but it was Henny, you still have a dilemma of a lack of a motive as you opine with the group. Are we only looking at the instructions and the ineffective assistance as to the Henning murder or are we looking at the Pagliaro murder as well? In my view, we're just looking at the Henning affair. That's the only thing we're looking at. So you've got really two somewhat implausible defenses and he chooses one over the other. Is that necessarily ineffective? Well, I don't know if it's that implausible that he had kind of a confrontation with Henny because even Travers stated during his deposition that he accepted this credit card as payment for the sexual services for a threesome in which, assuming that Pagliaro was going to be a participant, and Pagliaro couldn't get on the phone and they were using a corporate card and he thought that was somewhat unusual. And part of the defendant's statements was that Henny was also kind of sensitive to this and that she may have been suspicious about whether this was a bona fide transaction or not. So I can kind of see how there might be a source of confrontation between him and Henning that did not take place with regard to the other women. Do we have any knife found around wherever they were looking, but in particular the bedroom because that's where Henning was found? Did Henny have her fingerprints on it or her DNA on a knife? As I recall, no. Okay. And, in fact, she had her phone open at some point in time. Do we know if she was holding it or if it was on the floor when she screamed, or said, pardon me, what's that in your hand, oh no, oh no? Was she holding her phone? Well, we don't know that. I guess we're asked to infer that she was, but if she's really under assault, I'm wondering how this can be so audible. And I know we're dealing with, obviously, another part of the problem here is harmless error and this statement by Trowers that he hears this panicked voice about, you know, what have you got in your hand, oh my God. But we have to keep in mind that Trowers is, well, he's got a problem with Tiffany Duff because Tiffany Duff is good friends with Henning and they've known each other for years and Trowers is in a relationship with Duff. And it's in his interest to portray my client as a maniac with regard to Henning when, in fact, this tragic outcome is partly his fault because he accepted this payment from a credit card from a woman who couldn't even get to the phone. Was there argument that Trowers was lying about this phone call or is there some, I mean, didn't he call the police right after this? He did call 911, yes. Okay. But, I mean, the corroborates that he was, you know, he obviously was very concerned, but whether or not he actually heard these words on her, that I think is another matter. But, I mean, in sum, I think my position is I will admit that we lose, we should lose this case. Gary Shulman should lose this case if he denied causing anyone's death, but he didn't do that. And I would think that we should lose this case if the defense that was proffered really had any legs to it. But I think it was almost fantastic to say that we're going to lose some kind of credibility for that defense when it's really contrary to so many other facts. And that's my chief point. We lost the opportunity to defend one of these counts with really good evidence, and that's evidence right from the defendant's mouth. And I know how, you know, the state is. They get a statement from the defendant, and it contains various things that hurt the defendant and various things that help them. And as advocates, they can rely on the stuff that hurts the guy. But the jury kind of doesn't have that role. And they've got the defendants, you know, stating, you know, on tape, we should say DVD nowadays, again and again and again, this woman attacked me when she came out of the bathroom with this knife, and I panicked. And I think it would not have hurt this other defense to have asserted that, look, maybe the guy's not guilty as to any, because there was a justifiable use of force here. But doesn't he also admit in several statements that he killed his mother, Pamela? So what does the jury do when they hear that? Well, I think the convict is Pamela, yes. That's a murder conviction. In this argument of defense, in this case, he could have been acquitted of all charges. However, it isn't plausible, would you suggest it is? Well, running them alternatively is he's not barred from doing that. So he says it's not as though he's lost the opportunity totally. I'm not saying let's get rid of this other theory in favor of only one, and that's justifiable use of force. So he killed Peg Liero, but then he had self-defense on homing, is what you're saying. Well, that could have been a plausible outcome. It could have been an outcome that the jury would have seen best fit the facts of this case more assuredly. I can see my time's up. If there's any other questions. You'll have an opportunity for a reply. Thank you. Okay. Thank you very much. Mr. Meiser. Minzer. Sorry. May it please the Court. Thomas Minzer on behalf of the Topeka County State's Attorney's Office and the people of the State of Illinois Counsel. Your Honors, addressing the first point of the stricken test in the circumstance is the unreasonable standard. And here in this current case, trial strategy is virtually unassailable. And quite clearly from this case, from day one, defense counsel's strategy was to say the defendant did not commit the murders of either his honey or his mom. Even though he admits killing his mother and, I won't say embellishes, but adds details each time there's a conversation, that they had a confrontation, that, you know, he thought she was having a seizure and that's why he put something in her mouth. But then, well, but then he killed her. So even though he's admitted doing that, we just, we overlook that when we look at this unusual group theory? No, Your Honor. And, in fact, defense counsel in this case actually attributed that. And they brought in an expert witness to refute his admissions to police officers. And that's significant because, again, that's right in line with the trial strategy. In retrospect, bringing in that expert, refuting those statements allowed them to continue with that strategy that he did not commit any of these crimes. And she refuted that. I think it was a female who spent time with him, Kunzel or Kunkel or something like that. Yes. Because he had been drinking and he had taken maybe this ecstasy drug and cocaine and then had been injured. So all those things, the fantasy came from the drugs and the alcohol, but the injury caused something to happen. And I believe she, in addition, said that there was some coercion on part of the police and that they were interviewing him right after the surgery in that state. So based upon that, again, it's defense's trial strategy that attempted to negate the confessions that he made to the police. Counsel, let me ask you sort of a subtle question. Generally speaking, the decision to adopt one defense over another is considered to be trial strategy, immune from effective assistance. But isn't there another little caveat there? Doesn't the trial strategy have to be found to be sound? It isn't any trial strategy, is it? Doesn't it have to be considered to be a sound trial strategy? And how sound is this group invasion theory? Your Honor, well, it does have to be somewhat sound and reasonable. I mean, that is the first prompt, reasonable. Trial strategy in itself is giving great deference. And in this circumstance, Your Honor, where you have a murder case, two murders, it's quite understandable why defense counsel at this trial decided to go with this defense. You can't admit one murder to a jury and then say, well, the other one, it was in self-defense. Well, why not? He's saying that that could have been done. Well, Your Honor, just because something is plausible doesn't necessarily mean it was invalid trial strategy for counsel to not choose to go that direction. And, again, where you have two theories that which maybe now seemingly are a court would say that aren't the best, at the time, that's what we're worried about. At the time of trial, what was counsel thinking? Was this trial strategy truly reasonable? And, at the time, and, again, this is why the objective standard of reasonability in trial strategy is virtually unassailable, is that you don't want to play Monday morning quarterback, so to speak, with trial strategy. You don't look back and say, well, now that he's guilty, you picked the wrong strategy. You can't do that. But by the time of trial, when he forwarded the strategy to the jury, he knew, forensically, that Pagliaro had been killed sometime earlier and the escorts didn't start arriving until, what, 6 o'clock? So, you know, that kind of causes a problem with this any strategy, doesn't it? Not necessarily, Your Honor, and I think trial counsel did an adequate job of showing that there was an absence of really any evidence showing that his client wasn't that, the one who actually was involved. And pointing out the lack of fingerprints, I believe, earlier, the DNA evidence of another party that was at the scene. And although the time of death might have been at a different time, again, still, that was defense's trial strategy to pose this question and to pose the question that there wasn't anything absolutely linking his client to the murders of either party. So, based upon that, it was, again, trial strategy here from the beginning to the end. Although there might have been other strategies he could have imposed, he chose that. And, again, in hindsight, no matter what it is, we need to give deference to his trial counsel and that decision he made. If you would acknowledge, if not any theory, I mean, it has to be somewhat plausible and sound. If there's three alternative theories, just because a defense attorney picks one doesn't mean it's immune from an effective assistance of counsel claim, does it? Didn't you just say it has to be somewhat sound and reasonable? Well, Your Honor, again, the standard is just reasonability. And just because there are other standards doesn't, other defenses that were possible, doesn't mean that counsel wasn't reasonable. In this circumstance, we just need to look at what counsel chose. What did counsel do in this case and how did he do it? In this case, from day one, it was entirely consistent that the defense in the case was that the defendant did not commit the murders of his mother or of his head. So, is this case going to turn on our decision or our review of what we consider to be a sound trial strategy? No, Your Honor. What is it going to turn on? Your Honor, what this case is going to turn on ultimately is whether or not is the trial strategy in that, I should say not that it was reasonable, but in that the trial strategy that was chosen in this case. Was it sound? Was it sound, but with respect to the fact that the reasonability of it is not in looking at it after the trial and looking at it after all the testimony that was gathered. It's at the time they chose this defense, was it okay? Was it reasonable for counsel to pose this defense? And at the time, and again, with great deference, and again, quoting the Supreme Court language on it, the Supreme Court language on it, virtually unassailable, that they chose the strategy, they went with it until the very end, and were quite consistent in denouncing that the defendant even had anything to do with the murder of his mother or his head. And that's quite consistent, actually, with the case law on this, and I know it's a first district case, but the People v. Jones case is almost exactly factually similar to the case we have at hand, in which the defendant had trials to say it's nothing to do with the underlying crime that result in the death of one of the victims, and then on appeal says, whoa, wait, my counsel should have offered the self-defense jury instruction. Well, the self-defense jury instruction would have completely undermined the defense's theory of his trial, and that's what the court said. So it's not an effective assistance of counsel now, because offering that instruction would not have been consistent with your trial strategy. The defense also cited some cases in his brief that are quite clearly distinguishable from the circumstance we're dealing with here. In those cases, the context of which, first off, in the Peoria defense, the issue there was whether or not the jury instruction should have been given. It's not an effective assistance of counsel, which is a substantially different standard than what we're dealing with today. And with Jaffe, it was the only defense he had was self-defense. And that's what the court found was the error in the effective assistance on his counsel's part for not offering that instruction. Moving on to the prejudice point, even more so, Your Honors, is that the defendant in this case can't even show that he was in fact prejudiced by his counsel's failure to proffer this second-degree murder self-defense instruction. And that's just the overwhelming evidence that there was no self-defense in this case. I know it was mentioned earlier, the testimony of Mr. Trauer, who's on the phone with the victim, Ms. Hennig, just prior to her being killed. And her statement, what's in your hand? Oh, my God. Oh, my God. Oh, my God. That is not the type of statement that's coming from someone who's attacking the defendant. Do we just have Mr. Trauer's word in the record that this is the conversation that occurred? Or do we have some sort of physical evidence, phone records indicating that there was a call to him? Or is it just his word that she called? It was his word, Your Honor. And I believe there also were cell phone records that were tendered in the case indicating that there was a call placed at the time and the date that Mr. Trauer testified to and the date of the murders. So you also have, ultimately, credibility is based on the fact that you also have corroborating evidence as to his testimony against that phone call conversation. In addition, you also have in the forensic testimony, the DNA evidence, the fact that although no fingerprints of the defendant were found on any of the knives that could be made out, no fingerprints of Ms. Hennig could be found on any of the knives. In fact, the one knife Ms. Hennig had in her possession was in her purse, and that wasn't used. Which, circumstantially, if she had a knife in her possession, you would think that would be the knife that was used to commit any of the murders in this case, including the stabbing of the defendant. However, that wasn't the case. In addition, you even have defendant's own admissions, which stated that the injuries he suffered were self-inflicted, which, in fact, also was corroborated by a forensic expert who stated that the injuries the defendant suffered were consistent with self-inflicted injuries and not injuries that were present due to a self-defense or defending himself from Ms. Hennig. But indicated they were self-inflicted. How does that help the self-defense theory? Well, Your Honor, exactly. And that's the point in terms of the prejudicial effect that the testimony would have. It doesn't. It doesn't further that theory at all. And so looking at the prejudicial effect on it, even if that was tenor, you have testimony completely refuting not only self-defense from the forensic standpoint, but also defendant's own mouth. Lastly, Your Honor, with the prejudicial point of this test, you also have the defendant's mind state tonight. And it was mentioned earlier. He was under the influence of not only drugs but alcohol. And quite clearly, that affected him throughout the night. So in summation, if there are no more questions, it's the State's position that where there has been no showing that the defendant has suffered any prejudice as to his counsel's selected actions or that his counsel, in fact, was unreasonable, that defendant can't show that his counsel suffered from ineffective assistance of counsel. And it's the State's position that we would ask this Court to affirm his conviction as to the murder of Christy Holt. Did defense counsel show the DVDs, some of the DVDs of the statements during the defendant's testimony? Yes, they did, Your Honor. And what purpose was that for? Your Honor, the purpose of playing those statements in front of the jury was specifically for impeachment at that point. The defendant got on the stand and said he did not remember what happened. Yet they played these videos in front of the jury saying, well, this is what you told the police. And you remember giving those statements to the police. And essentially trying to have them explain, well, why did you give these statements to the police? Again, however, defense tried to undermine that by saying these statements that were given under-recorded were, in fact, coerced. And he was under the influence of drugs after surgery. That's why he made those statements that were not, in fact, truthful. Wouldn't a more reasonable, in light of the sentencing restrictions here, when you're convicted of two murders, wouldn't a more reasonable trial strategy have been to proceed as they did with the murder of Pagliaro, but then when you're looking at Honig or Hainig, to really ask for a compromise verdict there? To really ask for a verdict, even if the jury would reject the self-defense, to really ask for, in a sense, a verdict, a second degree on her? Your Honor, it may have been because of the fact that the jury was trying to undermine that. But again, the standard here isn't if it could have been reasonable, if it could have been a reasonable defense, if it could have been a defense at all. The standard here is looking at what the defense was actually claimed in the current case. And that defense, again, was quite consistent the entire time. And we don't want to go back. Again, we can't look back because in looking back, we don't know what was going on with the testimony. We don't know what evidence counsel had. That is what's important in looking at this because, again, we can't look in hindsight as a trial strategy. What we're supposed to do here is look at it from the standpoint of what was actually done and whether or not that fell below the objective standard of reasonableness for defense counsel. If there's nothing else, thank you. Mr. Wilkin, if you wish to respond. I have no further response unless there's any questions from the court. The only thing I'd like to ask is that the defendant's conviction as to handing me reverse and cause remanded for another trial. What is your take on why those videos were played during the defendant's testimony? Well, actually, the one was played during the state's case in chief, and that would have been the hospital conversation of the 27th. The other two were played kind of in response to the defendant's testimony. That he didn't remember anything? I think that they were admitted primarily for impeachment but also substantively because when he claimed not to have any memory, that's one of the very first things out of his mouth, that he had no memory. Anything that would show memory is arguably impeaching, and so they're going to bring it in for that purpose. And although you raise in your brief the failure to give the self-defense instruction, we've had a lot of conversation here today about the strategy itself. Which is the real focus? I mean, do we have to take the strategy first and then go to the instruction, or can we look at the strategy independently and the instruction independently when we make a decision in this case? Well, I think the kind of antecedent question is whether he could get the instruction. Let's just say he was complaining of judicial error. It was a matter of ineffective assistance of counsel. So then you would talk about the instructional law. You know, is there some evidence to support this and this type of thing? Is he somehow ineligible, which he's not, we would submit. And then you would go on to the strategy matter. And I'm tending to think that my opponent is dichotomizing this issue somewhat in the idea that these are absolutely, totally, mutually exclusive defenses. And I'm not so sure that's true, at least from the point of view of when we look at the fact that this particular case, this very one, is not that strong in the first place. Counsel, your opponent is indicating that it's his recollection that there was some evidence introduced at trial that cooperated his phone call from Henning to Towers. Do you recall anything about that? Well, as I recall, there is in the record, I think it's stipulated too, phone records, cell phone records from the defendant, Henning, Trowers, and Dove. So is there anything that shows that Henning called Towers about the time of this alleged statement? What's that in your hand? Is that really in dispute? No, no, it's not. Actually, there's evidence of, like, three phone calls to Henning about the time that she arrives at the house and after she's in the house, and the time of those calls, who placed those calls, and the duration of those calls is in the record. So she did place the call, apparently, ostensibly to Towers that would corroborate this argument that she made this statement to Towers, correct? Well, yeah, that is true. There's evidence. Okay. If that's true, is it likely that somebody is going to be making a cell phone call to somebody else who is in the process of killing somebody else? How plausible is that? Doesn't that totally militate against the self-defense theory? Well, I'm not actually sure whether she placed the last commandment from Towers to her. But even if it were Iran, let's say it's from her to him, I don't think that would be necessarily preclusive. Okay. Thank you. Okay, thank you very much. And, again, counsel, thank you for your arguments this morning. We will make a decision in due course. This court will now stand adjourned.